UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ABRAHAM G. PINZON, | ) | CIV-F-08-1543 AWI SKO |
| Plaintiff, | ) | |
| | ) | ORDER RE: MOTIONS FOR |
| v. | ) | SUMMARY JUDGMENT |
| | ) | |
| RON JENSEN, RON JENSEN | ) | |
| CONSTRUCTION, PINECREST | ) | |
| MARKET, DAN VAUGHN, and DOES 1- | ) | |
| 50, | ) | |
| | ) | (Docs. 55 and 68) |
| Defendants. | ) | |
| | ) | |

## I. History

Plaintiff Abraham G. Pinzon met and spoke with Defendant Dan Vaughn at the Strawberry Inn restaurant/bar in July 2006. Defendant Vaughn was renovating his private residence at the time. Defendant Ron Jensen was the general contractor on the project. After speaking with Pinzon at the Strawberry Inn, Vaughn hired him to do tile work on the project. Vaughn is part owner of Defendant Pinecrest Market, a general store. Vaughn also works as a clerk or manager of the store and is regularly found at that location. Pinzon, bringing a record of the hours he worked that week, would approach Vaughn on Friday afternoons at Pinecrest Market to be paid. Vaughn would take money out of the till of Pinecrest Market to pay Pinzon.

One Friday in August, Pinzon approached Vaughn at night at the Strawberry Inn. Pinzon

1

asked to be paid and Vaughn refused to pay him.  Pinzon insisted and Vaughn allegedly

threatened to shoot him.   The next day Pinzon, Jensen, and Vaughn met to discuss the problem

at the residence; Pinzon was paid.  Pinzon continued to work on the project and be paid on

Fridays.  Vaughn began to complain about the quality of Pinzon's work and the amount of time

the tile work was taking.  Pinzon was not paid on October 7, 2006.  On October 10, Vaughn

approached Pinzon at the residence and fired him.  Vaughn and Jensen told Pinzon that he was a

tresspasser who had to leave.  When Pinzon asked to be paid for his work over the last ten days,

Vaughn is alleged to have said, "sue me nigger."  Pinzon is of Puerto Rican ethnicity.

Pinzon filed suit in the small claims division of Superior Court, County of Tuolumne

(Case No. SC-15790) against Defendants Vaughn and Jensen.  On the complaint form, Pinzon

stated that the reason Defendants owed him money was that "contractor and home owner

welched on final 2 payments for the tile installations received." Doc. 28, Pinzon's Claim, at 4.  A

trial was held on January 22, 2007 before Judge Pro Tem Stephen Derkum.  Judge Derkum found

in favor of Defendants in a written decision. Doc. 28, Statement of Decision, at 7-10.

Specifically, he found that Pinzon did not have a contractor's license and was working for

Vaughn in the capacity of a contractor.  Cal. Bus. & Prof. Code §7031 absolutely bars any state

claim for compensation when an unlicensed individual does work for which he/she should be

licensed.  As a losing claimant in small claims court, Pinzon did not have the ability to file an

appeal.

Pinzon first filed suit in federal district court on August 14, 2008 (Pinzon v. Jensen, Civ.

Case No. 08-1193).  Pinzon named Ron Jensen, Ron Jensen Construction, Dan Vaughn,

Pinecrest Market, and the Superior Court, County of Tuolumne as defendants.  Pinzon made

claims under the Thirteenth Amendment, Fourteenth Amendment, Title VII of the Civil Rights

Act of 1964, the Ralph Act, 42 U.S.C. §1981, and 42 U.S.C. §1983, alleging the Defendants

failed to pay him for his tile work, subjected him to a hostile work environment, interfered with

his right to make contracts, and discriminated against him on the basis of race.  Pinzon was

proceeding pro se and in forma pauperis.  The complaint was screened Magistrate Judge Sandra

Snyder pursuant to 28 U.S.C. §1915(e)(2).  Judge Snyder issued a Findings and

1  Recommendation that the suit be dismissed for lack of subject matter jurisdiction under the

2  Rooker-Feldman doctrine.  No objections were filed and District Judge Lawrence O'Neill

3  dismissed the complaint, closing the case on October 1, 2008.

4   Pinzon filed a second suit in federal district court on October 14, 2009 (the present case).

5  Pinzon again named Ron Jensen, Ron Jensen Construction, Dan Vaughn, Pinecrest Market, and

6  the Superior Court, County of Tuolumne as defendants.  Pinzon made claims under the

7  Thirteenth Amendment, Fourteenth Amendment, Titles II, VI, and VII of the Civil Rights Act of

8  1964, the Ralph Act, 42 U.S.C. §1981, and 42 U.S.C. §1983, making similar allegations as in the

9  prior federal case.  Pinzon is again proceeding pro se and in forma pauperis.  Through screening

10  and a motion to dismiss, the only claims left are the Ralph Act and 42 U.S.C. §1981 claims

11  against Defendants Ron Jensen, Ron Jensen Construction, Dan Vaughn, and Pinecrest Market.

12   Vaughn and Pinecrest Market have made motions for summary judgment. Docs. 55 and

13  68.  Pinzon has opposed these motions but did not provide any evidence in opposition. Doc. 63.

14  In light of Pinzon's pro se status, Pinzon was allowed additional time to present evidence. Doc.

15  73.  Pinzon has not done so; these motions must be resolved using the materials provided by

16  Defendants.

17

18            **II. Legal Standards**

19   Summary judgment is appropriate when it is demonstrated that there exists no genuine

20  issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

21  Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v.

22  American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004).  The party seeking summary

23  judgment bears the initial burden of informing the court of the basis for its motion and of

24  identifying the portions of the declarations (if any), pleadings, and discovery that demonstrate an

25  absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986);

26  Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  A fact is "material" if it

27  might affect the outcome of the suit under the governing law. See Anderson v. Liberty Lobby,

28  Inc., 477 U.S. 242, 248-49 (1986); Thrifty Oil Co. v. Bank of America Nat'l Trust & Savings

1   Assn, 322 F.3d 1039, 1046 (9th Cir. 2002).  A dispute is "genuine" as to a material fact if there is

2   sufficient evidence for a reasonable jury to return a verdict for the non-moving party. Anderson

3   v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Long v. County of Los Angeles, 442 F.3d

4   1178, 1185 (9th Cir. 2006).

5          Where the moving party will have the burden of proof on an issue at trial, the movant

6   must affirmatively demonstrate that no reasonable trier of fact could find other than for the

7   movant. Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  Where the non-

8   moving party will have the burden of proof on an issue at trial, the movant may prevail by

9   presenting evidence that negates an essential element of the non-moving party's claim or by

10  merely pointing out that there is an absence of evidence to support an essential element of the

11  non-moving party's claim. See James River Ins. Co. v. Schenk, P.C., 519 F.3d 917, 925 (9th Cir.

12  2008).  If a moving party fails to carry its burden of production, then "the non-moving party has

13  no obligation to produce anything, even if the non-moving party would have the ultimate burden

14  of persuasion." Nissan Fire & Marine Ins. Co. v. Fritz Companies, 210 F.3d 1099, 1102-03 (9th

15  Cir. 2000).  If the moving party meets its initial burden, the burden then shifts to the opposing

16  party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec.

17  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The opposing party cannot "'rest

18  upon the mere allegations or denials of [its] pleading' but must instead produce evidence that

19  'sets forth specific facts showing that there is a genuine issue for trial.'" Estate of Tucker v.

20  Interscope Records, 515 F.3d 1019, 1030 (9th Cir. 2008).

21         The evidence of the opposing party is to be believed, and all reasonable inferences that

22  may be drawn from the facts placed before the court must be drawn in favor of the opposing

23  party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Stegall v. Citadel Broad,

24  Inc., 350 F.3d 1061, 1065 (9th Cir. 2003).  Nevertheless, inferences are not drawn out of the air,

25  and it is the opposing party's obligation to produce a factual predicate from which the inference

26  may be drawn. See Juell v. Forest Pharms., Inc., 456 F.Supp.2d 1141, 1149 (E.D. Cal. 2006);

27  UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004).  "A genuine issue of

28  material fact does not spring into being simply because a litigant claims that one exists or

**4**

1  promises to produce admissible evidence at trial." <u>Del Carmen Guadalupe v. Agosto</u>, 299 F.3d

2  15, 23 (1st Cir. 2002); see <u>Galen v. County of Los Angeles</u>, 477 F.3d 652, 658 (9th Cir. 2007);

3  <u>Bryant v. Adventist Health System/West</u>, 289 F.3d 1162, 1167 (9th Cir. 2002).  Further, a

4  "motion for summary judgment may not be defeated ...by evidence that is 'merely colorable' or

5  'is not significantly probative.'" <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50 (1986);

6  <u>Hardage v. CBS Broad. Inc.</u>, 427 F.3d 1177, 1183 (9th Cir. 2006).  Additionally, the court has

7  the discretion in appropriate circumstances to consider materials that are not properly brought to

8  its attention, but the court is not required to examine the entire file for evidence establishing a

9  genuine issue of material fact where the evidence is not set forth in the opposing papers with

10 adequate references. See <u>Southern Cal. Gas Co. v. City of Santa Ana</u>, 336 F.3d 885, 889 (9th Cir.

11 2003).  If the non-moving party fails to produce evidence sufficient to create a genuine issue of

12 material fact, the moving party is entitled to summary judgment. See <u>Nissan Fire & Marine Ins.</u>

13 <u>Co. v. Fritz Companies</u>, 210 F.3d 1099, 1103 (9th Cir. 2000).

### III. Statements of Material Facts

**A. Defendant Vaughn's and Plaintiff's Joint Statement**

1. This dispute arises out of an employment relationship between plaintiff and [some] of the defendants.

2. Plaintiff Abraham G. Pinzon, who throughout has proceeded in forma pauperis, alleges that during July through October 2006, he performed custom tile work for the defendants.

3. Mr. Pinzon alleges that defendants in unlawful and discriminatory employment practices by refusing to pay him for his work because of his race; defendants also allegedly threatened him with violence and fired him and from his job [and unequal treatment and unpaid wages].

4. Until mid-August of 2006, nothing of a discriminatory or racial nature occurred up to that

point.

5. On a riday evening in mid-August, plaintiff, who is Puerto Rican-American, went to a "half restaurant/half bar" called the Strawberry Inn.

6. Plaintiff may have been drinking at the time and claims Mr. Vaughn was drunk.

7. That Friday evening in the Strawberry Inn bar, Plaintiff asked Mr. Vaughn to pay plaintiff his wages, and according to plaintiff, Mr. Vaughn whom plaintiff believes was drunk at the time, said "I'm not going to pay you," and then said "I'm going to use my gun on you." [Mr. Pinzon could not pay for a drink because he had not been paid and had no money.]

8. Mr. Vaughn did not show plaintiff a gun; plaintiff does not know whether Mr. Vaughn had a gun in his possession and has never seen Mr. Vaughn was actually carrying a gun that day.

9. Nothing else of the substantive nature occurred that mid-August evening at the Strawberry Inn.

10. The next day, plaintiff showed up for work, resolution was reached, and plaintiff got paid the entire amount he was owed.

11. Plaintiff agrees that he did not believe he was going to get shot by Mr. Vaughn; otherwise plaintiff would not have showed up for work the next day and continued to work the next day and continued to work for six weeks and the mid-August incident.

12. The next event of any significance occurred on October 10, 2006.

13. Plaintiff again sought payment from Mr. Vaughn for his work, and according to plaintiff, Mr. Vaughn said "Hey, I'm not paying you." Then, according to plaintiff, Mr. Vaughn said "Hey, sue

me nigger."

14. Plaintiff did not respond to Mr. Vaughn's statements because plaintiff was in a homicidal rage. Mr. Jensen then "shoos" plaintiff from the worksite, telling him to get off the property.

15. Plaintiff was upset, but left the job site without further incident and has had no additional conversation with Mr. Vaughn at any other time [except at the small claims hearing].

16. Plaintiff admits he is not aware of any other people that Mr. Vaughn has supposedly mistreated other than himself and is not aware of any Hispanics [] that may have in any way been mistreated by Mr. Vaughn.

17. In December 2006, plaintiff filed a lawsuit in state court over this same dispute and lost; following a small claims court trial, judgment was entered against plaintiff and in favor of the defendants.

18. Mr. Pinzon pursued racial discrimination-based claims and threats of violence claims, and filed a series of complaints in this court culminating on March 6, 2009, when plaintiff filed the operative amended complaint.

**B. Defendant Pinecrest's and Plaintiff's Joint Statement**

**1. 42. U.S.C. §1981, Issue 1- Plaintiff Cannot Establish That He Had Any Contractual Agreement or Employment Relationship With Defendant Pinecrest Market**

1. Mr. Pinzon alleges that he was hired as an employee of Pinecrest market.

2. Pinzon alleges that Pinecrest Market discriminated against him based upon his race by making "numerous comments about Plaintiff's African American ancestry, used the word 'nigger' and

other racial epithets in Plaintiff's presence and directed at Plaintiff and made disparaging remarks about Plaintiff and the quality of his work."

3. Pinzon alleges that Defendant Pinecrest Market refused to pay him the agreed amount and stated to the Plaintiff "sue me for it nigger."

4. Pinzon's claim for workplace discrimination arises out of custom tile work that he performed at the home of Defendant Dan Vaughn between July 2006 and October 2006.

5. Pinzon claims that Pinecrest Market is liable for workplace discrimination because it was his employer and "responsibility lies with the employer."

6. Pinzon did not ever have any written or oral employment agreement with Mr. Vaughn or any other person regarding work to be performed at the Pinecrest Market.

7. Pinzon did not provide any pre-employment documents to Pinecrest Market prior to commencing the tile installation services at Vaughn's personal residence.

8. No employment application, W-2 form, other income tax form, emergency contact form or other insurance document exists evidencing any employment relationship between Pinzon and Pinecrest Market.

9. Pinzon has never performed any work at the Pinecrest Market.

10. Pinzon worked "solely on Mr. Vaughn's home on Old Strawberry Dr.; July 5, '06 through October 10, '06."

11. Defendant Vaughn and Pinzon met at the Strawberry Inn and that is where Mr. Vaughn asked

Pinzon to perform tile work at his personal residence.

12. At all times, it was understood between Pinzon and Mr. Vaughn that any work Pinzon performed would be at Mr. Vaughn's personal residence.

13. On a weekly basis, Pinzon would visit the Pinecrest Market to meet with Vaughn and tell him what was owed for the work Pinzon had performed at Vaughn's personal residence in the prior week.

14. Throughout the time that Pinzon worked on the project at Vaughn's personal residence, whenever Pinzon went to the Pinecrest Market to meet with Vaughn and turn in his weekly hours summary, Vaughn would immediately pay Pinzon from the till or the safe at the Market.

15. Mr. Vaughn works at the Pinecrest Market.

16. Until mid-August of 2006, nothing of a discriminatory or racial nature occurred that was identifiable to Pinzon.

17. Sometime in August 2006, Pinzon approached Vaughn at the Strawberry Inn and turned in his hours for the prior week.

18. Pinzon alleges that in the Strawberry Inn Mr. Vaughn told him that he was not going to pay him for the prior week's work.

19. Pinzon alleges that in the Strawberry Inn Mr. Vaughn also told him that he'd use his gun on Pinzon.

20. Mr. Vaughn did not show plaintiff a gun; plaintiff does not know whether Mr. Vaughn had a

gun in his possession and has never seen Mr. Vaughn with a gun. Plaintiff has no facts leading him to believe that Mr. Vaughn was actually carrying a gun that evening.

21. Nothing else of a substantive nature occurred that mid-August evening at the Strawberry Inn.

22. Pinzon alleges that being threatened by Mr. Vaughn at the Strawberry Inn contributed to his hostile work environment.

23. The threat to use a gun on Pinzon that Mr. Vaughn allegedly made on August 15, 2006 at the Strawberry Inn is the only verbal threat that Pinzon alleges occurred in this case.

24. Pinzon did not ever complain to Mr. Vaughn about any statements or incidents of discrimination by employees of Ron Jensen construction or other sub contractors working on Mr. Vaughn's personal residence before October 10, 2006.

25. On October 10, 2006, Pinzon alleges that Mr. Vaughn came to his residence on Old Strawberry Drive, refused to pay Pinzon for his last ten days of work and "shooshed" him off the property.

26. Pinzon alleges that after Mr. Vaughn came to his residence on Old Strawberry Drive and told Pinzon he was not going to pay him, Mr. Vaughn then told him "hey, sue me nigger."

27. Pinzon was upset, but left the job site without further incident.

28. Pinzon bases his opinion that Pinecrest Market was his employer solely on the facts that Mr. Vaughn allegedly paid Pinzon from the Market's till and/or safe and that Mr. Vaughn was the manager and/or owner of the Market.

**2. 42 U.S.C. §1981, Issue 2- Plaintiff Cannot Be Vicariously Liable For Alleged Conduct Engaged In By Vaughn Because Vaughn Was Not Acting Within The Scope Of His Employment With Market When The Alleged Discrimination Occurred**

29. Mr. Pinzon alleges that he was hired as an employee of Pinecrest Market.

30. Pinzon alleges that Pinecrest Market discriminated against him based upon his race by making "numerous comments about Plaintiff's African American ancestry, used the word 'nigger' and other racial epithets in Plaintiff's presence and directed at Plaintiff and made disparaging remarks about Plaintiff and the quality of his work."

31. Pinzon alleges that Defendant Pinecrest Market refused to pay him the agreed amount and stated to the Plaintiff "sue me for it nigger."

32. Pinzon's claim for workplace discrimination arises out of custom tile work that he performed at the home of Defendant Dan Vaughn between July 2006 and October 2006.

33. Pinzon claims that Pinecrest Market is liable for workplace discrimination because it was his employer and "responsibility lies with the employer."

34. Pinzon did not ever have any written or oral employment agreement with Mr. Vaughn or any other person regarding work to be performed at the Pinecrest Market.

35. Pinzon did not provide any pre-employment documents to Pinecrest Market prior to commencing the tile installation services at Vaughn's personal residence.

36. No employment application, W-2 form, other income tax form, emergency contact form or other insurance document exists evidencing any employment relationship between Pinzon and

Pinecrest Market.

37. Pinzon has never performed any work at the Pinecrest Market.

38. Pinzon worked "solely on Mr. Vaughn's home on Old Strawberry Dr.; July 5, '06 through October 10, '06."

39. Defendant Vaughn and Pinzon met at the Strawberry Inn and that is where Mr. Vaughn asked Pinzon to perform tile work at his personal residence.

40. At all times, it was understood between Pinzon and Mr. Vaughn that any work Pinzon performed would be at Mr. Vaughn's personal residence.

41. On a weekly basis, Pinzon would visit the Pinecrest Market to meet with Vaughn and tell him what was owed for the work Pinzon had performed at Vaughn's personal residence in the prior week.

42. Throughout the time that Pinzon worked on the project at Vaughn's personal residence, whenever Pinzon went to the Pinecrest Market to meet with Vaughn and turn in his weekly hours summary, Vaughn would immediately pay Pinzon from the till or the safe at the Market.

43. Mr. Vaughn works at the Pinecrest Market.

44. Until mid-August of 2006, nothing of a discriminatory or racial nature occurred that was identifiable to Pinzon.

45. Sometime in August 2006, Pinzon approached Vaughn at the Strawberry Inn and turned in his hours for the prior week.

46. Pinzon alleges that in the Strawberry Inn Mr. Vaughn told him that he was not going to pay him for the prior week's work.

47. Pinzon alleges that in the Strawberry Inn Mr. Vaughn also told him that he'd use his gun on Pinzon.

48. Mr. Vaughn did not show plaintiff a gun; plaintiff does not know whether Mr. Vaughn had a gun in his possession and has never seen Mr. Vaughn with a gun. Plaintiff has no facts leading him to believe that Mr. Vaughn was actually carrying a gun that evening.

49. Nothing else of a substantive nature occurred that mid-August evening at the Strawberry Inn.

50. Pinzon alleges that being threatened by Mr. Vaughn at the Strawberry Inn contributed to his hostile work environment.

51. The threat to use a gun on Pinzon that Mr. Vaughn allegedly made on August 15, 2006 at the Strawberry Inn is the only verbal threat that Pinzon alleges occurred in this case.

52. Pinzon did not ever complain to Mr. Vaughn about any statements or incidents of discrimination by employees of Ron Jensen construction or other sub contractors working on Mr. Vaughn's personal residence before October 10, 2006.

53. On October 10, 2006, Pinzon alleges that Mr. Vaughn came to his residence on Old Strawberry Drive, refused to pay Pinzon for his last ten days of work and "shooshed" him off the property.

54. Pinzon alleges that after Mr. Vaughn came to his residence on Old Strawberry Drive and told Pinzon he was not going to pay him, Mr. Vaughn then told him "hey, sue me nigger."

13

55. Pinzon was upset, but left the job site without further incident.

56. Pinzon bases his opinion that Pinecrest Market was his employer solely on the facts that Mr. Vaughn allegedly paid Pinzon from the Market's till and/or safe and that Mr. Vaughn was the manager and/or owner of the Market.

**3. Ralph Act, Issue 1- Pinecrest Market Cannot Be Vicariously Liable For The Threat Allegedly Made By Vaughn Because The Undisputed Facts Establish That It Was Not Made Within The Scope Of Vaughn's Employment With Pinecrest Market**

57. Pinzon alleges that Defendant Pinecrest Market is liable to him under section 51.7 ("the Ralph Act") of the California Civil Code.

58. Pinzon bases his Ralph Act claim on an alleged threat made by Dan Vaughn on August 15, 2006.

59. The threat to use a gun on Pinzon that Mr. Vaughn allegedly made on August 15, 2006 at the Strawberry Inn is the only verbal threat that Pinzon alleges occurred in this case.

60. There were no incidents of violence or threats between Pinzon and Vaughn prior to August 15, 2006 that are identifiable to Pinzon.

61. On the evening of Friday, August 15, 2006, Pinzon did not see Defendant Vaughn until that evening at the Strawberry Inn.

62. At the time that the alleged threat occurred, Pinzon was in the Strawberry Inn to shoot pool.

63. At the time that the alleged threat occurred, Mr. Vaughn was in the Strawberry Inn drinking

alcohol.

64. Pinzon approached Vaughn at the Strawberry Inn and turned in his hours for the prior week.

65. Pinzon alleges that in the Strawberry Inn, Mr. Vaughn told him that he was not going to pay him for the prior week's tile work that Pinzon had performed at Mr. Vaughn's personal residence.

66. Pinzon alleges that in the Strawberry Inn, Mr. Vaughn told Pinzon: "I'm going to use my gun on you."

67. Mr. Vaughn did not show plaintiff a gun; plaintiff does not know whether Mr. Vaughn had a gun in his possession and has never seen Mr. Vaughn with a gun.  Plaintiff has no facts leading him to believe that Mr. Vaughn was actually carrying a gun that day.

68. Nothing else of the substantive nature occurred that mid-August evening at the Strawberry Inn between Vaughn and Pinzon.

69. Pinzon returned to the job site at Mr. Vaughn's personal residence the day after the alleged incident at the Strawberry Inn and got paid the entire outstanding amount that he was owed before he left the site that day.

70. Pinson did not report the incident to any law enforcement authority on August 15, 2006 or at anytime prior to the termination of his employment.

**4. Ralph Act, Issue 2- Plaintiff Cannot Establish That The Alleged Threat Was Of Such A Nature That A Reasonable Person In Plaintiff's Position Would Have Felt Threatened Or Intimidated**

71. Pinzon did not report the alleged threat from August 15, 2006 to the Tuolumne County Sheriff's Department until after October 10, 2006.

72. Pinzon alleges that Defendant Pinecrest Market is liable to him under section 51.7 ("the Ralph Act") of the California Civil Code.

73. Pinzon bases his Ralph Act claim on an alleged threat made by Dan Vaughn on August 15, 2006.

74. The threat to use a gun on Pinzon that Mr. Vaughn allegedly made on August 15, 2006 at the Strawberry Inn is the only verbal threat that Pinzon alleges occurred in this case.

75. There were no incidents of violence or threats between Pinzon and Vaughn prior to August 15, 2006 that are identifiable to Pinzon.

76. On the evening of Friday, August 15, 2006, Pinzon did not see Defendant Vaughn until that evening at the Strawberry Inn.

77. At the time that the alleged threat occurred, Pinzon was in the Strawberry Inn to shoot pool.

78. At the time that the alleged threat occurred, Mr. Vaughn was in the Strawberry Inn drinking alcohol.

79. Pinzon approached Vaughn at the Strawberry Inn and turned in his hours for the prior week.

80. Pinzon alleges that in the Strawberry Inn, Mr. Vaughn told him that he was not going to pay him for the prior week's tile work that Pinzon had performed at Mr. Vaughn's personal residence.

81. Pinzon alleges that in the Strawberry Inn, Mr. Vaughn told Pinzon: "I'm going to use my gun on you."

82. Mr. Vaughn did not show plaintiff a gun; plaintiff does not know whether Mr. Vaughn had a gun in his possession and has never seen Mr. Vaughn with a gun.  Plaintiff has no facts leading him to believe that Mr. Vaughn was actually carrying a gun that day.

83. Nothing else of the substantive nature occurred that mid-August evening at the Strawberry Inn between Vaughn and Pinzon.

84. Pinzon returned to the job site at Mr. Vaughn's personal residence the day after the alleged incident at the Strawberry Inn and got paid the entire outstanding amount that he was owed before he left the site that day.

85. Pinzon did not report the incident to any law enforcement authority on August 15, 2006 or at anytime prior to the termination of his employment.

86. Pinzon did not report the alleged threat from August 15, 2006 to the Tuolumne County Sheriff's Department until after October 10, 2006.

**C. Defendant Pinecrest's Separate Statement**

**1. 42. U.S.C. §1981, Issue 1- Plaintiff Cannot Establish That He Had Any Contractual Agreement or Employment Relationship With Defendant Pinecrest Market**

1. When Pinzon first met Vaughn, Vaughn was not at the Market and was not "on-shift" as an employee for the Market.

2. When Pinzon agreed to perform tile setting services at Vaughn's personal residence, Vaughn

was not acting on behalf of the Market.

3. When Pinzon agreed to perform tile setting services at Vaughn's personal residence, there was no discussion of the Market whatsoever.

4. Vaughn is a corporate officer and part owner of the Market.

5. The Market is a general store that sells grocery and other household items in the Pinecrest Resort area near Pinecrest Lake.

6. The Market has no ownership interest in Vaughn's private residence located at 28421 Old Strawberry Drive in Strawberry, California.

7. Vaughn sometimes works as a store clerk in the Market and is often present at the Market premises overseeing the operation of the business.

8. Vaughn was rarely present at his residence during the time that Pinzon was performing the setting services there.

9. Vaughn would sometimes borrow funds from the till of the safe located on the premises of the Market to provide payment to Pinzon for his services.

10. Each time that funds were borrowed from the till or the safe at the Market, Vaughn would promptly and fully reimburse the Market from his personal funds.

11. Pinzon was sometimes contentious and impatient while on the job site and when visiting Vaughn at the Market to receive payment for his services.

1   12. On October 19, 2006, Vaughn decided to terminate Pinzon's provision of tile services at

2   Vaughn's personal residence because he was dissatisfied with Pinzon's performance.

3

4   **2. 42 U.S.C. §1981, Issue 2- Plaintiff Cannot Be Vicariously Liable For Alleged Conduct**

5   **Engaged In By Vaughn Because Vaughn Was Not Acting Within The Scope Of His**

6   **Employment With Market When The Alleged Discrimination Occurred**

7

8   13. When Pinzon first met Vaughn, Vaughn was not at the Market and was not "on-shift" as an

9   employee for the Market.

10

11   14. When Pinzon agreed to perform tile setting services at Vaughn's personal residence, Vaughn

12   was not acting on behalf of the Market.

13

14   15. When Pinzon agreed to perform tile setting services at Vaughn's personal residence, there

15   was no discussion of the Market whatsoever.

16

17   16. Vaughn is a corporate officer and part owner of the Market.

18

19   17. The Market is a general store that sells grocery and other household items in the Pinecrest

20   Resort area near Pinecrest Lake.

21

22   18. The Market has no ownership interest in Vaughn's private residence located at 28421 Old

23   Strawberry Drive in Strawberry, California.

24

25   19. Vaughn sometimes works as a store clerk in the Market and is often present at the Market

26   premises overseeing the operation of the business.

27

28   20. Vaughn was rarely present at his residence during the time that Pinzon was performing the

setting services there.

21. Vaughn would sometimes borrow funds from the till of the safe located on the premises of the Market to provide payment to Pinzon for his services.

22. Each time that funds were borrowed from the till or the safe at the Market, Vaughn would promptly and fully reimburse the Market from his personal funds.

23. Pinzon was sometimes contentious and impatient while on the job site and when visiting Vaughn at the Market to receive payment for his services.

24. On October 19, 2006, Vaughn decided to terminate Pinzon's provision of tile services at Vaughn's personal residence because he was dissatisfied with Pinzon's performance.

**3. Ralph Act, Issue 1- Pinecrest Market Cannot Be Vicariously Liable For The Threat Allegedly Made By Vaughn Because The Undisputed Facts Establish That It Was Not Made Within The Scope Of Vaughn's Employment With Pinecrest Market**

25. On the evening of August 15, 2006, Vaughn was not at the Strawberry Inn on behalf of the Market.

26. When Pinzon approached Vaughn on August 15, 2006, Vaughn had completed his work for the day at the Market and was enjoying his night off.

27. When Pinzon approached Vaughn on August 15, 2006, Vaughn was enjoying leisure time with his personal acquaintances.

**IV. Discussion**

**A. Section 1981**

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other....the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. §1981.

Pinzon asserts that when approached at the worksite, Vaughn said "Hey, I'm not paying you" and when Pinzon protested, Vaughn said "Hey, sue me nigger." Doc. 68, Part 5, Ex. D. Pinzon Deposition, at 110:14-23. Vaughn asserts "what was said is nothing more than a stray remark made by Mr. Vaughn. It is not sufficient to demonstrate discrimination and is not part of any type of employment related action." Doc. 552, Part 2, Vaughn Brief, at 12:7-9. "'[S]tray' remarks are insufficient to establish discrimination." Merrick v. Farmers Ins. Group, 892 F.2d 1434, 1438 (9th Cir. 1990), citations omitted. The Second Circuit has described the framework for considering stray remarks: "the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination. For example, remarks made by someone other than the person who made the decision adversely affecting the plaintiff may have little tendency to show that the decision-maker was motivated by the discriminatory sentiment expressed in the remark. The more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be." Tomassi v. Insignia Fin. Group, Inc., 478 F.3d 111, 115 (2nd Cir. 2007), citations omitted. Stray remarks are comments "unrelated to the decisional process" such that they "are insufficient to demonstrate that the employer relied on illegitimate criteria, even when such statements are made by the decision-maker in issue." Smith v. Firestone Tire & Rubber Co., 875 F.2d 1325, 1330 (7th Cir. 1989).

In this case, the epithet was spoken by Vaughn, the decision-maker. It was not used in a

way that suggests it was a rationale for refusing to pay Pinzon. See Franklin v. Sacramento Area Flood Control Agency, 2009 U.S. Dist. LEXIS 45229, *50 (E.D. Cal., Apr. 29, 2009) (statement that defendant could not work with someone who filed a discrimination claim was relevant as it was made in direct response to learning plaintiff had filed such a claim against a co-worker). Instead, it appears to have been a gratuitous insult spoken once the parties started quarreling. However, it was used almost simultaneously with the adverse employment action. See EEOC v. Republic Servs., Inc., 640 F. Supp. 2d 1267, 1286 (D. Nev. 2009) ("closeness of time" between the remark and the employment action is a significant consideration).  The clear hostility embodied by the epithet also cuts in favor of finding discriminatory intent. Cordova v. State Farm Ins. Cos., 124 F.3d 1145, 1149 (9th Cir. 1997) (in case where decision maker was complaining about company's affirmative action program, "Calling someone a 'dumb Mexican' is an egregious and bigoted insult, one that constitutes strong evidence of discriminatory animus on the basis of national origin").  One final consideration is that Pinzon only asserts Vaughn used the epithet once. See Lakes v. Chertoff, 2008 U.S. Dist. LEXIS 51036, *30 (N.D. Cal., July 1, 2008) ("the use of the 'N word' on one occasion at an unidentified time and under undisclosed circumstances does not constitute sufficient evidence from which a trier of fact could infer that [defendant's] request that [plaintiff] not be assigned to the subject overtime shift was because of racial animus").

The facts of this case make the decision very close.  In the end, the key facts are that Vaughn did not use the epithet in a way that suggests it was a motivating rationale for firing Pinzon and there is no other evidence of discriminatory intent aside from this single alleged use of the epithet.  Pinzon admitted that there were no other incidents which lead him to believe Vaughn had any discriminatory intent. Doc. 68, Part 5, Ex. D, Pinzon Deposition, at 104:5-15. Regarding why Pinzon was fired, Vaughn stated that "I was of the opinion that the time it was taking Mr. Pinzon to complete the project was excessive. It had been nearly three months since Mr. Pinzon began his work and he purported to be working nearly forty hours per week setting tile." Doc. 68, Part 5, Ex. A, Vaughn Declaration, at 3:23-25.  Pinzon admitted that Vaughn voiced minor complaints about his work at the time. Doc. 68, Part 5, Ex. D, Pinzon Deposition,

1    at 83:13-18.  Taking all reasonable inferences in favor of Pinzon, the non-moving party, there is

2    insufficient evidence for a jury to find that the contract was not honored due to racial animus.

3    Summary adjudication of the Section 1981 cause of action is granted to both Vaughn and

4    Pinecrest Market.

6    **B. Section 51.7**

7         Pinzon alleges that on August 15, 2006, Vaughn "said he wasn't going to pay me. And

8    then he blurted out in front of many witnesses that - that he'd use his gun on me. I found that to

9    be a threat to my life from an employer." Doc. 68, Part 5, Ex. D, Pinzon Deposition, at 74:8-11.

10   California's Ralph Civil Rights Act states in relevant part, "All persons within the jurisdiction of

11   this state have the right to be free from any violence, or intimidation by threat of violence,

12   committed against their persons or property because of political affiliation, or on account of [sex,

13   race, color, religion, ancestry, national origin, disability, medical condition, marital status, or

14   sexual orientation], or position in a labor dispute, or because another person perceives them to

15   have one or more of those characteristics." Cal. Civ. Code §51.7(a).

16        Pinzon has not presented any evidence that the incident was related to one of the

17   protected characteristics listed.  Vaughn's alleged use of the racial epithet was two months later.

18   Pinzon agreed that there was no indication of racial animus before the mid August incident: "Q.

19   Up through mid August of 2006 no events had occurred that caused you to believe that there

20   were any racial, prejudicial, prejudice, civil rights violations, anything like that; correct? A. I - I-

21   none that I can nail down, no." Doc. 68, Part 5, Ex. D, Pinzon Deposition, at 63:14-18.  Pinzon

22   has not provided any evidence that the threat of gun use was motivated by race.  Further, a

23   general contract or work dispute does not appear to qualify as a "labor dispute." See Cabesuela v.

24   Browning-Ferris Indus., 68 Cal. App. 4th 101, 111 (Cal. App. 6th Dist. 1998) (retaliatory firing

25   due to complaints about health and safety conditions does not qualify as labor dispute under

26   Section 51.7), superseded on other grounds by Venegas v. County of Los Angeles, 32 Cal. 4th

27   820, 841 (Cal. 2004) (violation of Section 52.1 is not contingent on violation of Section 51.7).

28   The contract dispute did not involve any union activity.

Defendants also argue that the incident in question was sufficiently serious to rise to the level of "intimidation by threat of violence."  "The test is: 'would a reasonable person, standing in the shoes of the plaintiff, have been intimidated by the actions of the defendant and have perceived a threat of violence?'" Winarto v. Toshiba Am. Elecs. Components, Inc., 274 F.3d 1276, 1289 (9th Cir. 2001).  Both Pinzon and Vaughn had been drinking and the altercation was in a restaurant/bar. Doc. 68, Part 5, Ex. D, Pinzon Deposition, at 71:5-13.  There is some case law that suggest threatening boasts made in the context of a fight do not suffice. Cf. D.C. v. R.R., 182 Cal. App. 4th 1190, 1219 (Cal. App. 2d Dist. 2010) ("The threat in this case was not merely a few words shouted during a brawl").  However, the court need not make a firm pronouncement on this point.

Summary adjudication of the Section 51.7 cause of action is granted to both Vaughn and Pinecrest Market.

### V. Order

Defendant Vaughn's and Defendant Pinecrest Market's motions for summary judgment are GRANTED.

IT IS SO ORDERED.

Dated:   August 12, 2011          _____
                                   CHIEF UNITED STATES DISTRICT JUDGE